United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                         NORTHERN DISTRICT OF CALIFORNIA

10

11   CRAIG YATES,                              No. C-11-01573 DMR

12           Plaintiff(s),

13       v.                                    **FINDINGS OF FACT AND
                                               CONCLUSIONS OF LAW**
14   BACCO;  VI  PA,  INC.,  a  California
     Corporation;   ANTONE   METAXAS   and
15   HIDEKO METAXAS, TRUSTEES OF THE
     2006 METAXAS FAMILY TRUST UNDER
16   DECLARATION  OF  DEED  OF  TRUST
     DATED MARCH 15, 2006,
17
             Defendant(s).
18   _____/

19

20                            **I.  INTRODUCTION**

21           This case concerns the accessibility of Bacco, a restaurant in San Francisco.  Plaintiff Craig

22   Yates patronized Bacco on four occasions between 2010 and 2011.  On March 31, 2011, Plaintiff

23   brought this lawsuit against Defendants Bacco, Vi Pa, Inc., and Antone Metaxas and Hideko

24   Metaxas, Trustees of the 2006 Metaxas Family Trust Under Declaration of Trust Dated March 15,

25   2006 (the "Trust"), alleging that Defendants failed to remove architectural barriers at Bacco in

26   violation of the Americans with Disabilities Act of 1990 ("ADA"), the California Disabled Persons

27   Act ("CDPA"), the Unruh Act, and California Health and Safety Code § 19955 et seq.  First Am.

28   Compl. ("FAC") [Docket No. 31] at ¶¶ 1, 21-22.

United States District Court

For the Northern District of California

1    The parties agree that Plaintiff encountered a number of architectural barriers during his

2  visits, and brought them to Defendants' attention.  The parties also agree that, with the exception of

3  the issues that were presented to the court for trial, Defendants addressed Plaintiff's concerns to his

4  satisfaction.

5    The court held a bench trial in this matter.  At trial, Plaintiff asserted the existence of three

6  architectural barriers in one of Bacco's restrooms, and argued that his suggested plan for removing

7  each of those barriers was "readily achievable" under the ADA.  Plaintiff sought injunctive relief

8  under the ADA, as well as statutory damages permitted under state law.  The parties filed consents

9  to this court's jurisdiction pursuant to 28 U.S.C. § 636(c).  [Docket Nos. 5, 9.]  The court therefore

10  may enter judgment in the case.  *See* 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 72(b); N.D. Cal. Civ.

11  L.R. 72-1.  The court finds that Plaintiff has established that one of the three alleged architectural

12  barriers can be remediated by means that are readily achievable.  Accordingly, the court orders

13  corresponding injunctive relief, as well as statutory damages.  Pursuant to Federal Rule of Civil

14  Procedure 52(a), the court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT[1]

**A.  Parties**

1.  Plaintiff Craig Yates is triplegic and is a "disabled person" within the meaning of the
    ADA.  JFF 1.

2.  Plaintiff is a disability access activist.  Tr. 33:14-16.  He has filed at least 150 ADA
    lawsuits.  Tr. at 33:8.

3.  Bacco is a restaurant located at 737 Diamond Street in San Francisco, and is a place of
    public accommodation within the meaning of the ADA.  JFF 2.

---

[1]  The parties submitted four different documents that purport to contain stipulated undisputed facts. These documents are: a list of undisputed facts in their joint pretrial statement (Docket No. 60 at 5-9), a Stipulation of Facts attached to their joint pretrial statement (Docket No. 60, Ex. A), Joint Findings of Fact and Conclusions of Law ("JFF", Docket No. 62) filed prior to the bench trial, and a Revised Agreed Findings Statement ("RAFS," Docket No. 91) filed after trial.  Unfortunately, each submission is different from the others, and none references the others. The court refers to all of these to the extent they clearly represent the parties' uncontested statements of facts and law.  The court also refers as needed to two other documents submitted by the parties after trial: Plaintiff's Findings of Fact and Conclusions of Law ("PFFCL," Docket No. 90), and Defendants' Proposed Findings of Fact and Conclusions of Law ("DFFCL," Docket No. 92).

United States District Court

For the Northern District of California

4.  Defendants Antone Metaxas and Hideko Metaxas, Trustees of the 2006 Metaxas Family Trust Under Declaration of Trust Dated March 15, 2006 (the "Trust"), owns the building in which Bacco is housed, and is Bacco's landlord. JFF 3, Tr. 150:3-6.   Antone Metaxas provided testimony on behalf of the Trust.

5.  Sharon Dominici owns and runs Defendant Bacco through Vi Pa, Inc.   JFF 4, Tr. 142-144.

**B.  Non-Party Witnesses**

1.  Rick Sarantschin testified for Plaintiff regarding his personal observations, measurements, and photographs of the alleged architectural barriers at Bacco.

2.  Gaylon Gregg, an architect and licensed building contractor, was called by Plaintiff as an expert witness regarding the cost of implementing certain repairs that would address the alleged architectural barriers.

3.  Kim Blackseth, a certified access specialist and licensed general building contractor, was called by Defendants as an expert witness regarding his personal observations of Bacco, his recommended remedial measures, and whether removal of certain architectural barriers is readily achievable.  Tr. at 82:14-83:23.

**C.  The Subject Property, the Restaurant, and the Trust**

1.  The building in which Bacco is housed is an "existing" facility under the ADA because it was constructed prior to and not altered after January 26, 1992.  Tr. 83:3-7, 86:2-5.  *See* 28 C.F.R. §§ 36.401, 36.402.

2.  Bacco began operating at its current location in approximately June 1993.  Tr. at 135:22-136:2.

3.  Dominici's husband Paolo operated the restaurant from its opening until his death in a boating accident in 2009.  Tr. at 136:9-18, 143:17-18.

4.  Dominici took over operation of the restaurant in 2010.  Tr. at 136:22-23.  Dominici was not able to testify about the restaurant's rent or profits prior to 2010, when she began operating the restaurant.  Tr. at 136:3-137:5.

United States District Court

For the Northern District of California

5.  Bacco's monthly rent for the years 2010 to 2012 was $5,900.  Tr. at 136:13-15, 136:24-137:2, 151:7-8.  The Trust has not raised Bacco's rent since 2009 out of sympathy for the death of Dominici's husband.  The rent is below market rate.  Tr. at 155:6-20.

6.  Bacco's net profits in 2010 were roughly $70,000 to $78,000.  Tr. at 148:4-14.

7.   Bacco has employed approximately ten employees since 2010.  Tr. at 137:16-138:6.

8.  According to Metaxas, the Trust purchased the building that houses Bacco in approximately 1980 for $395,000.  The market value of the building is now several million dollars.  Tr. at 150:7-25.

9.  When asked by Plaintiff's counsel whether the Trust could afford to spend $10,000 on capital improvements at Bacco, Metaxas responded in the affirmative.  Tr. at 154:19-21

**D.  Relevant Events**

1.  Plaintiff dined at Bacco on December 15, 2010, January 13, 2011, February 24, 2011, and March 9, 2011.  RAFS at 2.

2.  During each of Plaintiff's visits, numerous architectural barriers existed at Bacco, including the steepness of the ramp leading to the entrance, the entrance door pressure, as well as its handle/knob and width, the width of the men's restroom doorway and the maneuvering space within the men's restroom.  PFFCL 7; DFFCL 3, 6; Tr. at 29:11-31:25.

3.  Plaintiff was unable to enter the restroom on each of his four visits to Bacco in 2010-2011.  Tr. at 30:21-31:25.

4.  On December 17, 2010, after his initial visit, Plaintiff sent a notice letter to the owner of the building as well as the manager of Bacco.  JFFCL 6, Pl.'s Exs. 1, 2.  The letter describes the difficulties Plaintiff encountered in accessing the restaurant.  *See, e.g.* Pl.'s Ex. 1 ("[W]hen I went to use the restroom I had a lot of difficulty.  First, you had those chairs stacked outside the restroom, then when I got to the door the entrance was too narrow.  Even with all the help the bus boy tried to give me I still couldn't use the restroom. Not being able to use the restroom was not good and it could have caused me a medical problem.").  It also recommended that the owner and manager repair the access

United States District Court

For the Northern District of California

problems and inform Plaintiff of any plans to do so. *Id.* ("[P]lease . . . tell me exactly what will be done and make me a promise that you will take care of this right away.").

5. Defendants hired Kim Blackseth to review Bacco for compliance with state and federal access laws. DFFCL 4, Tr. 84:19-25. Blackseth's company has provided disability access consulting services for somewhere between 3,000 to 4,000 clients. In the litigation context, Blackseth has provided expert witness services for both plaintiffs and defendants, about 60% of the time on the defense side. Tr. at 83:24-84:3.

6. On June 17, 2011, Blackseth visited Bacco to assess its compliance with disability access laws. On June 21, 2011, Blackseth prepared a report identifying architectural barriers and suggesting repairs/alterations to "bring [Bacco] into substantial compliance with applicable codes and requirements." Defs.' Ex. A at 1, 22 (Blackseth Report). Blackseth's suggestions included reducing the entrance door pressure, providing signage on the exterior door, providing an electric door opener on both leaves of the entrance doors, relocating furniture within the restaurant, lowering the paper towel dispenser and mirror in the men's restroom, providing a wall-mounted sink to replace the pedestal sink[2] in the men's restroom, and providing a grab bar behind the toilet. *Id.* at 9-20; Tr. 87-:15-88:11, 144:11-145:2.

7. Following Blackseth's suggestions, Bacco installed a power door at a cost of $8,000, half of which was paid for by Bacco and the other half by the landlord. Tr. 139:18-140:1.

8. Another post-remediation change involved converting what was formerly the men's room into a unisex restroom. RAFS 4. The $7,000 cost for alterations to the restroom was borne by Bacco alone. Tr. at 140:2-10. The total cost of all remediations suggested by Blackseth was approximately $20,000, including the portion paid by the landlord. Tr. at 145:7-9, 147:18-25.

---

[2] The ADA Accessibility Guidelines use the term "lavatory" to refer to a sink provided for hand washing, and "water closet" for what is colloquially called a toilet. *See* 36 C.F.R. Pt. 1191, App. D.

9.   Bacco completed all[3] of the alterations recommended by Blackseth prior to the date of the trial.[4]  Tr. 144:11-145:2.

10. On October 30, 2012, Plaintiff visited Bacco again.  Tr. at 157:1-3.  Plaintiff attempted to use the unisex restroom.  Plaintiff was able to enter the restroom, turn around, and close the door, but he was unable to exit because he could not operate the door and maneuver his wheelchair at the same time.  Tr. at 4-19.

### III. Conclusions of Law

**A.  Legal Standards**

   **i.  Discrimination Under Title III of the ADA**

Congress passed the ADA "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2).  Title III of the ADA prohibits discrimination against disabled individuals by public accommodations.  *Id.* at § 12182(a).  The landlord and tenant are both liable for failing to provide accessible facilities at the public accommodation.  28 C.F.R. § 36.201(b).

To recover on a claim for discrimination under the ADA, a plaintiff must prove (1) he or she is disabled within the meaning of the statute, (2) defendants are private entities that own, lease (or lease to), or operate a place of public accommodation, and (3) the plaintiff was denied public accommodations by defendant(s) because of his or her disability.  *Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc.*, 603 F.3d 666, 670 (9th Cir.2010).  Here, the parties have stipulated that the first two elements have been met.

The third element is satisfied when there is a violation of applicable accessibility standards.  *Chapman v. Pier 1 Imports (U.S.), Inc.*, 631 F.3d 939, 945 (9th Cir. 2011).  In general, a place of

---

[3]  Blackseth testified that he did not see one of his recommended remediations—a rear grab bar behind the toilet in the men's room—in Plaintiff's photographic exhibits.  Tr. at 87:14-24.  However, the parties stipulated that the rear grab bar was installed on August 16, 2013, the day after the first day of trial.  *See* RAFS 8.  Plaintiff does not raise the late installation of the grab bar as a basis for Defendants' liability for disability discrimination.  Tr. at 5:17-6:11.

[4]  The court made multiple requests that the parties submit a joint declaration setting forth the dates of various remediations.  The parties failed to do so.  As a result, the court cannot be more specific than the following.  "As-is" refers to the conditions at Bacco as Plaintiff encountered them in his visits to the restaurant between December 15, 2010 and March 9, 2011.  The "post-remediation" condition of Bacco refers to its state after completion of the recommendations that Blackseth opined as being readily achievable in his report.

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

1    public accommodation is accessible under the ADA if it meets the requirements promulgated by the

2    Attorney General in the "ADA Accessibility Guidelines" or the "ADAAG," which is "essentially an

3    encyclopedia of design standards." *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 904-905 (9th Cir.

4    2011)*; see* 28 C.F.R. § 36.406; 28 C.F.R. pt. 36, app. A.  However, less rigorous standards are

5    imposed on facilities constructed prior to the ADA's enactment, which are considered "existing"

6    facilities.[5]  Because the building that houses Bacco was constructed before and not altered after

7    January 26, 1992, it is an "existing" facility under the ADA.

8            Existing, unaltered facilities such as Bacco's need not fully comply with the ADAAG

9    standards.  Instead, the ADA focuses first on the existence of architectural barriers.  The ADA does

10   not define "architectural barrier," but courts have held that "architectural barriers" are essentially

11   elements that do not meet ADAAG standards.  *See Wyatt v. Ralphs Grocery Co.*, 65 F. App'x 589,

12   590 (9th Cir. 2003) ("Violations of ADAAG standards indicate the existence of an architectural

13   barrier.") (citing *Parr v. L&L Drive-Inn Rest.*, 96 F.Supp.2d 1065, 1086 (D. Haw. 2000)); *Moeller v.*

14   *Taco Bell Corp.*, No. 02-cv-05849 MJJ, 2007 WL 2301778, at *5 (N.D. Cal. Aug. 8, 2007)

15   ("Although existing facilities are not required to comply with the ADAAG (unless they have been

16   altered), the ADAAG nevertheless provides guidance for determining whether an existing facility

17   contains architectural barriers."); *Pickern v. Best W. Timber Cove Lodge Marina Resort*, No. 00-cv-

18   1637-WBS-DA, 2002 WL 202442, at *2 (E.D. Cal. Jan. 18, 2002) *superseded in part*, 194 F. Supp.

19   2d 1128 (E.D. Cal. 2002) ("[The ADAAG] . . . provides valuable guidance for determining when

20   existing facilities contain architectural barriers that must be removed where readily achievable.  In

21   fact, the implementing regulations promulgated by the Department of Justice treat any element in an

22   existing facility that does not meet or exceed the ADAAG standards as a barrier to access.")

23   (citations and quotations omitted).

24           An architectural barrier need only be removed where it is "readily achievable" to do so.  42

25   U.S.C. § 12182(b)(2)(A)(iv).  The removal of barriers is "readily achievable" when it is "easily

26

27           [5]  The Title III accessibility standards come in three broad categories: the "new construction"
28   provisions, which apply to public accommodations first occupied after January 26, 1993; the "alteration"
     provisions, which apply to post-January 26, 1992 alterations to buildings that existed as of that date; and
     the "readily achievable" provisions, which apply to unaltered portions of buildings constructed before
     January 26, 1992.  28 C.F.R. §§ 36.401, 36.402.  *See also Moeller v. Taco Bell Corp.*, 816 F.Supp.2d
     831, 847 (N.D. Cal. 2011).

7

accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9). In determining whether an action is "readily achievable," factors to be considered include:

> (A) the nature and cost of the action needed under this chapter;
>
> (B) the overall financial resources of the facility or facilities involved in the action; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such action upon the operation of the facility;
>
> (C) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and
>
> (D) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C. § 12181(9). The federal regulations give some examples of "modest measures that may be taken to remove barriers that are likely to be readily achievable": installing ramps, repositioning shelves, rearranging furniture, repositioning telephones, widening doors, installing offset hinges, repositioning a paper towel dispenser, designating accessible parking spaces, and installing raised toilet seats. 28 C.F.R. Pt. 36, App. B at 647; § 36.304(b).

If full compliance with the applicable ADAAG standard is not readily achievable, "a public accommodation may take other readily achievable measures to remove the barrier that do not fully comply with the specific requirements. Such measures include, for example, providing a ramp with a steeper slope or widening a doorway to a narrower width than that mandated by the alterations requirements. No measure shall be taken, however, that poses a significant risk to the health or safety of individuals with disabilities or others." 28 C.F.R. § 36.304(d)(3).

The flexible nature of the "readily achievable" standard takes into account the "imperfect realities of disability access law compliance." *Rodriguez v. Barrita, Inc.*, _ F. Supp. 2d. _, No. 09-cv-4057-RS, 2014 WL 31739, at *14 (N.D. Cal. Jan. 3, 2014).

### ii. Burden of Proving Removal Is "Readily Achievable"

"The Ninth Circuit has yet to rule on whether the plaintiff or defendant bears the burden of proof in showing that removal of an architectural barrier is readily achievable, [but] the Ninth Circuit and several district courts within the Ninth Circuit have applied the burden-shifting framework set forth in *Colorado Cross Disability Coalition v. Hermanson Family, Ltd.*, 264 F.3d

United States District Court

For the Northern District of California

1    999 (10th Cir.2001)." *Freemyer v. Kyrene Vill. II, LLC*, No. 10-cv-1506-PHX-GMS, 2011 WL

2    42681. at *5 (D. Ariz. Jan. 6, 2011).

3          In *Colorado Cross*, the Tenth Circuit held that the plaintiff bears the initial burden of proving

4    (1) the existence of an architectural barrier and (2) suggesting a method of removing the barrier that

5    is "readily achievable," that is, "easily accomplishable and able to be carried out without much

6    difficulty or expense." *Colorado Cross*, 264 F.3d at 1002-03; 42 U.S.C. § 12181(9); *Hubbard v.

7    Rite Aid Corp.*, 433 F. Supp. 2d 1150, 1159 (S.D. Cal. 2006).  If the plaintiff satisfies his initial

8    burden, the burden shifts to Defendants to show that removing the architectural barrier is not readily

9    achievable.  Defendants "bears the ultimate burden of persuasion that barrier removal is not readily

10   achievable . . . ." *Colorado Cross*, 264 F.3d at 1003; *see also Strong v. Valdez Fine Foods*, No. 09-

11   CV-1278-MMA JMA, 2011 WL 455285 (S.D. Cal. Feb. 4, 2011) *rev'd on other grounds*, No. 11-

12   55265, -- F.3d -- , 2013 WL 3746097 (9th Cir. July 18, 2013).  This court will follow the

13   "overwhelming majority of federal courts that apply the burden-shifting framework of *Colo. Cross*."

14   *Freemyer*, 2011 WL 42681 at *6 (quotation omitted).

15         Some courts have offered guidance on how a plaintiff may meet his initial burden of proving

16   the existence of an architectural barrier and suggesting a readily achievable method for its removal.

17   *See, e.g., Gathright-Dietrich v. Atlanta Landmarks, Inc.*, 452 F.3d 1269, 1274 (11th Cir. 2006) ("[A]

18   plaintiff must present sufficient evidence so that a defendant can evaluate the proposed solution to a

19   barrier, the difficulty of accomplishing it, the cost implementation, and the economic operation of

20   the facility"); *Pascuiti v. New York Yankees*, No. 98-CV-8186 SAS, 1999 WL 1102748, at *4

21   (S.D.N.Y. Dec. 6, 1999) (a plaintiff "must consider the four factors identified in 42 U.S.C. §

22   12181(9)2 and proffer evidence, including expert testimony, as to the ease and inexpensiveness of

23   their proposed method of barrier removal"); *Colorado Cross*, 264 F.3d at 1009 (plaintiff failed to

24   satisfy its initial burden where its expert provided only speculative conceptual sketches for the

25   proposed modification rather than a specific design which would be easily accomplishable and able

26   to be carried out without much difficulty or expense).

27   **B.  Actionable Barriers**

28              **i.  Remediated Barriers**

9

United States District Court
For the Northern District of California

1    Because a private plaintiff can sue only for injunctive relief (i.e., for removal of the barrier)

2    under the ADA, a defendant's voluntary removal of alleged barriers prior to trial can have the effect

3    of mooting a plaintiff's ADA claim.  *Oliver*, 654 F.3d at 905 (citing 42 U.S.C. §§ 2000a-3(a),

4    12188(a)(2)).  Prior to trial, the parties stipulated that several barriers have been remediated since

5    the commencement of this action.  Accordingly, Plaintiff's ADA claim is moot with respect to those

6    barriers.  Plaintiff also appears to have abandoned any argument that these barriers could form the

7    basis of state law claims. *Cf. Oliver*, 651 F.3d at 905 ("The ADA provides for attorneys' fees and

8    costs for prevailing plaintiffs, however, and ADA plaintiffs frequently seek damages by bringing

9    parallel claims under applicable state civil rights laws.") (citation omitted); *Hernandez v. Polanco*

10   *Enterprises, Inc.*, -- F.Supp.2d --, 2013 WL 4520253, at *4 (N.D. Cal. August 23, 2013) (granting

11   motion for summary judgment against plaintiff's Cal. Civ. Code § 54 and Unruh Act claims because

12   plaintiff "made no showing that those barriers could support state-law claims independent of the

13   alleged [mooted] ADA violations").

14   **ii.  Remaining Barriers**

15   A significant problem in this case is that Plaintiff failed to establish the alleged architectural

16   barriers with precision. In large part, Plaintiff did not set forth each alleged barrier, identify the

17   applicable ADAAG standard, and provide testimony or briefing on why it amounted to a legally

18   cognizable architectural barrier.  The lack of those specifics makes it difficult to analyze not only

19   whether the alleged barriers exist, but also whether Plaintiff's proposed remedy for each barrier is

20   readily achievable.  As noted below, Defendants made a mid-trial "motion for non-suit," arguing

21   that Plaintiff had not met the threshold for his claims because he failed to establish the existence of

22   each  architectural barrier.[6]  However, as discussed below, in one instance, the defense expert

23   himself acknowledged the existence of an architectural barrier, and in another, the parties had

24   stipulated to the existence of the barrier.  Due to the chaotic state of the evidence on both sides, the

25

26

27

28   [6]  Defendants did not articulate the procedure through which it asserted "non-suit": the court
     construed Defendants' request as a motion for judgment on partial findings under Federal Rule of Civil
     Procedure 52(c) ("If a party has been fully heard on an issue during a nonjury trial and the court finds
     against the party on that issue, the court may enter judgment against the party on a claim or defense that,
     under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The
     court may, however, decline to render any judgment until the close of the evidence.").

court denied the mid-trial motion and has spent considerable time and effort in unpacking the evidence for analysis in this opinion.

Plaintiff contends that post-remediation, the following architectural barriers remain in the unisex restroom, and their removal is readily achievable:

1. **Barrier 1:** The door swings into the clear space in the restroom, rather than out into the hallway outside the restroom;

2. **Barrier 2:** There is insufficient clear space in the restroom in front of the toilet; and

3. **Barrier 3:** The doorway to the restroom is not wide enough.

Pl.'s Ex. 39 (Sarantschin report noting that these three elements had not been remediated); Tr. at 5:17-25.

**C.  Plaintiff's Suggested Plan for Remediation**

Plaintiff suggested a plan for removing the above barriers that he claims is "readily achievable."  That plan, a diagram of which was entered into evidence as Plaintiff's Exhibit 42, involves the following elements:

1. Change the direction of the restroom door so that it swings out into the hallway outside the restroom, instead of into the restroom, Tr. at 41:14-23;

2. Rotate the toilet 90 degrees so that it faces the door of the restroom, and also reposition the sink.  This would create more clear space in front of the toilet by positioning the toilet so that its front edge is 35" from the edge of the sink and 60" from the door, Tr. at 40:13-41:13; and

3. Widen the restroom door from 30" to 32" or 34" by widening the doorframe and installing a new door, Pl's. Ex. 42; Tr. at 41:14-23.  At trial, Plaintiff's counsel elicited testimony about another suggested remediation not previously mentioned in any of Plaintiff's briefs or exhibits: Gregg testified that installation of offset hinges on the doorway would provide an additional inch and a half of clearance.  Tr. at 72:21-73:16.

**D.  Plaintiff's ADA Claims**

**i.  Door Swing Direction**

**a.  Is the door swing direction an architectural barrier?**

United States District Court

For the Northern District of California

1    The door to the unisex restroom swings inward toward the clear space of the restroom, rather

2    than out into the hallway outside the restroom.[7]

3    At trial, Defendants' counsel moved for judgment on partial findings, see *supra* n. 6, on the

4    basis that Plaintiff had failed to present evidence establishing that the accessibility issues identified

5    by Plaintiff, including the door swing direction, constituted architectural barriers. *See* Tr. at 49:18-

6    53:05; 78:12-80:8.  To prove a prima facie case of violation of the ADA, Plaintiff must put forth

7    evidence establishing the existence of architectural barriers. *Lieber v. Macy's West, Inc.,* 80

8    F.Supp.2d 1065, 1077 (N.D. Cal. 1999) ("Plaintiffs bear the burden of establishing the existence of

9    access barriers . . . "); *Martinez v. Columbia Sportswear USA Corp.,* 859 F.Supp.2d 1174, 1178

10   (E.D.Cal.2002) ( "Plaintiff has not provided any evidence regarding the height of the checkout

11   counter at Eddie Bauer's Store.  Therefore, this portion of Eddie Bauer's summary judgment motion

12   is granted . . . ").

13   Plaintiff did not call any witness to testify about what elements of Bacco constituted

14   architectural barriers.  Sarantschin testified about location and measurements of features in the

15   bathroom.  But Plaintiff did not provide a witness to testify about how those features and

16   measurements amounted to architectural barriers.  Nor did Plaintiff provide any legal argument

17   regarding specific ADAAG standards, including any that prohibit in-swinging doors.  In contrast,

18   Defendant's expert testified that the swing direction of the door was likely not an architectural

19   barrier.  Tr. at 100:2-8 ("I am not sure the door swinging in would be an impediment.  Because it's a

20   unisex restroom, the new ADA says if the door swings in, it can swing to the clear space.").  The

21   1991 ADAAG standards prohibit doors from swinging into the clear floor space required for any

22   fixture.  28 C.F.R. Pt. 36, App. D §§ 4.22.2.[8]  The 2004 revisions to the ADAAG maintain this

23

24   ───────────────

[7] Plaintiff did not put forward any clear piece of evidence demonstrating that the door was in-
25   swinging as of the date of trial.  The court cobbles together this inference from the following facts.  The
parties stipulated that during Plaintiff's visits to Bacco, the door to the unisex restroom (at that time the
26   men's restroom) swung into the restroom.  JFFCL ¶ 12.  Plaintiff also entered into evidence a report by
Sarantschin stating that he had inspected Bacco on September 17, 2012 and that the "door still swings
27   into restroom."  Pl.'s Ex. 39 at 2.  *See also* Pl.'s Ex. 28 (photograph dated September 17, 2012 showing
in-swing of door).  The court assumes that the in-swinging door existed as of the date of trial because
28   Defendants did not offer evidence to the contrary.

[8] The 1991 ADAAG standards are available on the website of the United States Access Board.
*See* http://www.access-board.gov/guidelines-and-standards/buildings-and-sites/about-the-ada-standards/
background/adaag (last accessed Feb. 10, 2014).

12

United States District Court
For the Northern District of California

1    prohibition, but permit doors "to swing into the required turning space" inside the restroom.[9]  36

2    C.F.R. Pt. 1191, App. D § 603.2.3.  The 2004 revisions also provide several exceptions to the

3    prohibition, including the following: "Where the toilet room or bathing room is for individual use

4    and a clear floor space complying with [Section] 305.3 [providing a clear floor space of 30 inches by

5    48 inches] is provided within the room beyond the arc of the door swing, doors shall be permitted to

6    swing into the clear floor space or clearance required for any fixture." *Id.*  Plaintiff offered no

7    evidence demonstrating that the post-remediation configuration of the door fails to comply with

8    ADAAG.  Plaintiff thus has not met his burden of demonstrating that the inward swing of the

9    restroom door constitutes an architectural barrier.

10                **b.  Would Plaintiff's suggested method of removing the barrier improve access?**

11            Even if Plaintiff had met his burden of establishing that the inward swing of the restroom

12   door constitutes an architectural barrier, he failed to make any showing that changing the door from

13   an inward to an outward swing would improve the accessibility of the restroom.  Plaintiff presented

14   no evidence or argument on this matter, and Defendants' expert did not opine either way.

15                **c.  Is Plaintiff's suggested method of removing the barrier readily achievable?**

16            Furthermore, even if Plaintiff had established that the inward swing of the restroom door was

17   an architectural barrier and that changing its swing direction would provide better access, Plaintiff's

18   suggestion of reversing the direction of the swing is not readily achievable.  Plaintiff's expert

19   admitted such an alteration would violate state building codes.  Pl.'s Ex. 42 (corridor is only 42"

20   wide); Tr. at 72:3-16 (Gregg testifying that code requirements required a 60" wide corridor for a

21   door opening into a corridor, and that he did not know whether one would be able to obtain a permit

22   for Plaintiff's suggested plan).  Defendant's expert further testified that an alteration that violated

23   state building codes would not be permitted by the authorizing agency.  Tr. at 100:2-3.  *Cf. Moeller*

24   *v. Taco Bell Corp.*, No. 02-cv-5849-MJJ, 2007 WL 2301778, at *17-18 (N.D. Cal. Aug. 8, 2007)

25   ("The fact that building inspectors have discretionary governmental immunity as to the issuance of

26   building and occupancy permits does not otherwise empower them to actually issue permits for

27   facilities that violate statutory or regulatory requirements . . . building inspectors do not have

28

---

         [9]  The 2004 ADAAG standards are available on the website of the U.S. Department of Justice,
Civil Rights Division. *See* http://www.ada.gov/regs2010/2010ADAStandards/2010ADAstandards.htm
(last accessed Feb. 10, 2014).

United States District Court

For the Northern District of California

1  discretion to issue building permits or certificates of occupancy for facilities that do not comply with

2  [the California Building Code].").

3        Plaintiff makes a generalized argument that the California Building Code is preempted by the

4  ADA "to the extent that . . . its forced application by a local building department official frustrates a

5  public accommodation's ability" to remove a barrier, such that this court may not consider whether

6  his suggested repair would be permitted under state building codes when determining whether that

7  repair is "readily achievable."  PFFCL at 13.

8        It is well-established that Congress has the power to preempt state law. U.S. Const. Art. VI,

9  cl. 2; *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516 (1992).  It may do so expressly or

10  impliedly.  *Cipollone,* 505 U.S. at 516. Congress' intent may be "explicitly stated in the statute's

11  language or implicitly contained in its structure and purpose."  *Id.* (quoting *Jones v. Rath Packing*

12  *Co.,* 430 U.S. 519, 525 (1997))  *Id.* Nothing in the ADA expressly preempts state regulation of

13  building codes, so preemption, if any, must be implied.[10]

14        There are two types of implied preemption: conflict preemption and field preemption.

15  *Montalvo v. Spirit Airlines,* 508 F.3d 464, 470 (9th Cir. 2007).  Field preemption is inapposite here.[11]

16  With respect to conflict preemption, "where Congress has not entirely displaced State regulation in a

17  specific area, State law will still be preempted to the extent that it actually conflicts with federal

18  law."  *Pacific Gas and Elec. Co.*, 461 U.S. at 204.  Conflict preemption exists where "compliance

19  with both federal and state regulations is a physical impossibility, or where state law stands as an

20  obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.*

21  (citations omitted); *Montalvo*, 508 F.3d at 470.

22        When addressing questions of preemption, the court must begin its analysis "with the

23

24        [10]  Section 501(b) of the ADA provides that state laws which provide greater or equal protection
25  to individuals with disabilities are explicitly not preempted.  *See* 42 U.S.C. § 12201.

26        [11]  Courts will find a state law field-preempted when congressional intent to "supercede state law
27  altogether may be found from a scheme of federal regulation so pervasive as to make reasonable the
    inference that Congress left no room to supplement it, because the Act of Congress may touch a field
    in which the federal interest is so dominant that the federal system will be assumed to preclude
28  enforcement of state laws on the same subject, or because the object sought to be obtained by the federal
    law and the character of obligations imposed by it may reveal the same purpose." *Pacific Gas and Elec.*
    *Co. v. State Energy Res. Conservation and Dev. Comm'n,* 461 U.S. 190, 204 (1983) (internal quotations
    omitted).  Plaintiff does not appear to argue that the ADA preempts California's building standards in
    their entirety.

United States District Court

For the Northern District of California

1   assumption that the historic police powers of the States [are] not to be superseded by the Federal Act

2   unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.,* 331

3   U.S. 218, 230 (1947).  That assumption applies with particular force when, as here, Congress has

4   legislated in a field traditionally occupied by the States. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485

5   (1996); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001) ("Because federal law is said to

6   bar state action in a field of traditional state regulation, namely, advertising, we work on the

7   assumption that the historic police powers of the States are not to be superseded by the Federal Act

8   unless that is the clear and manifest purpose of Congress.") (quotations and brackets omitted).

9   "[W]hen the text of a preemption clause is susceptible of more than one plausible reading, courts

10  ordinarily accept the reading that disfavors preemption." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77

11  (2008) (citations omitted).

12          Congressional intent is the "ultimate touchstone" of any preemption analysis, express or

13  implied. *Gade v. Nat'l Solid Wastes Management Ass'n,* 505 U.S. 88, 96 (1992).  In determining

14  Congressional intent to preempt, a court must "begin with the language employed by Congress and

15  the assumption that the ordinary meaning of the language accurately expresses the legislative

16  purpose," *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 383 (1992), because "[t]he first and

17  most important step in construing a statute is the statutory language itself." *Royal Foods Co., Inc. v.

18  RJR Holdings, Inc.,* 252 F.3d 1102, 1106 (9th Cir. 2001) (citing *Chevron USA v. Natural Resources

19  Defense Council,* 467 U.S. 837, 842-44 (1984)).

20          The ADA defines discrimination as, inter alia, "the failure to remove barriers . . . in existing

21  facilities . . . ***where such removal is readily achievable***."  42 U.S.C. § 12182(b)(2)(A)(iv) (emphasis

22  added).  "The term 'readily achievable' means easily accomplishable and able to be carried out

23  without much difficulty or expense."  42 U.S.C. § 12181(9).  One factor to be considered in the

24  determination of whether an action is readily achievable is "the nature and cost of the action

25  needed."  *Id.*  Moreover, the ADA regulations further specify that "no measure shall be taken ...  that

26  poses a significant risk to the health or safety of individuals with disabilities or others."  28 C.F.R. §

27  36.304(d)(3).

28          Removal of barriers under the ADA is a conditional rather than absolute requirement.  It may

be excused if it is not "readily achievable," i.e. "easily accomplishable and able to be carried out

United States District Court

For the Northern District of California

1   without much difficulty or expense."  Nothing in the ADA precludes the court from determining in a

2   particular instance that "readily achievable" includes consideration of whether a suggested repair

3   would be permitted under a state building standard.  Conversely, the bare fact that a particular

4   building code may appear to prohibit a suggested remediation does not necessarily mean that the

5   remediation is not readily achievable.  "Preemption analysis should take place on a case by case

6   basis." *Adkins v. Mireles*, 526 F.3d 531, 541 (9th Cir. 2008).  *See also Williamson v. Gen. Dynamics*

7   *Corp.*, 208 F.3d 1144, 1155 (9th Cir. 2000) ("Preemption issues . . . must be decided on a case-by-

8   case basis.").  Here, Plaintiff makes a universal argument that the ADA preempts a building code "to

9   the extent that . . . its forced application by a local building department official frustrates a public

10  accommodation's ability" to remove a barrier.  PFFCL at 13.  Plaintiff did not identify a particular

11  conflict upon which the court could perform a preemption analysis.  Under the plain meaning of the

12  ADA provisions, and given the lack of specificity in Plaintiff's argument, there is no actual conflict

13  between the ADA and the state building code.

## ii.  Clear Space

### a.  Does the lack of clear space in the restroom constitute an architectural barrier?

17      The post-remediation configuration of the restroom provides only 21" of clear space between

18  the front of the toilet and the wall, and 18-20" between the toilet and the sink to its left.  Pl.'s Ex. 39;

19  Blackseth Report at 20; Tr. at 109:14-23.

20      With respect to the sufficiency of the clear space in the restroom in front of the toilet,

21  Plaintiff did not provide any reference to the applicable ADAAG provision, or otherwise establish

22  the legal foundation for an architectural barrier.   However, Defendants themselves, through their

23  stipulations and expert witness, provide the basis for the court's finding that this element constitutes

24  an architectural barrier.  Blackseth's report notes that even after his recommended remediations are

25  made, the restroom will not fully comply with applicable standards because (1) the room dimensions

26  are 55" by 89", which is not large enough for the 60" diameter turning area requirement, and (2) the

27  toilet provides only 21" of space from the front of the toilet to the face of the wall.  Blackseth Report

28  at 15-20.  Blackseth referred to these as "ADA barrier[s]." *Id.* at 16.  Blackseth also testified at trial

that the insufficient clear space in the restroom was in fact an architectural barrier because it

1   rendered the restroom noncompliant with ADAAG standards.  Tr. at 92:3-4 ("[T]he 60-inch turning

2   circle that's required is not going to fit in a 55-inch wide restroom.").  In addition, Defendants

3   stipulated prior to trial that "[t]he men's restroom does not have sufficient clear floor space pursuant

4   to ADAAG 4.16.2 which requires a minimum of 56" by 60" and therefore constituted an

5   architectural barrier."  JFFCL at 4 ¶ 6.  *Accord* 36 C.F.R. Pt. 1191, App. D § 604.3.1 (requiring

6   clearance around toilet to be 60 inches measured perpendicular from the side wall and 56 inches

7   minimum measured perpendicular from the rear wall); 28 C.F.R. Pt. 36, App. D § 4.16.2, Fig. 28

8   (providing three possible configurations for the required clear floor space around a toilet); § 4.2.3

9   (requiring wheelchair turning space of 60 inches in diameter or a 60 by 60 inch T-shaped space).

10   The court therefore finds that through the parties' stipulations and Defendants' submissions and

11   testimony, Plaintiff has met his burden of demonstrating that the lack of clear floor space in the

12   restroom constitutes an architectural barrier.

13                **b.  Would Plaintiff's suggested method of removing the barrier improve access?**

14        Defendants' expert admitted that Plaintiff's suggested plan for repositioning the sink and

15   toilet would provide better accessibility for disabled users than the restroom in its current state.  Tr.

16   at 109:14-111:02 (the suggested plan's relocation of the sink is "better" than the post-remediation

17   placement of the sink); 108:5-19 (Blackseth testifying that rotating the toilet would make it easier

18   for a person in a wheelchair to make a side transfer onto the toilet); 124:10-23 ("I would agree [that

19   Plaintiff's suggested plan is] better than Diagram 1 [depicting the restroom as Plaintiff first

20   encountered it].").

21                **c.  Is Plaintiff's suggested method of removing the barrier readily achievable?**

22        Plaintiff elicited testimony by expert Gaylon Gregg on the cost of the suggested repairs.

23   Gregg provided a cost estimate that itemized the cost of materials, labors, permits, and other

24   requirements for executing Plaintiff's suggested plan for all of the bathroom remediations.  Pl.'s Ex.

25   37 ("Gregg Report").  Gregg also testified at trial.  *See* Tr. 55:25-77:23.

26        Gregg's report estimates that the total cost of the suggested plan, including changing the door

27   swing, widening the door, turning the toilet, and repositioning the sink, would be $4,104.33.  Gregg

28   Report at 8.  Gregg's trial testimony was not a model of clarity.  For example, Gregg estimated the

     total cost of rotating the toilet to be "about a hundred dollars."  Tr. at 66:23-67:3.  The court

**United States District Court**
For the Northern District of California

1    questioned Gregg further regarding the costs for rotating the toilet, since it was not clear from the

2    testimony, report or exhibits whether rotation of the toilet would necessitate significant replumbing.

3    *See* Tr. at 73:22-75:13.  Gregg testified without much elaboration that the existing plumbing could

4    be used for the rotated toilet through the addition of an offset flange, and that his estimate included

5    labor and material contingencies that would cover that cost.  Tr. at 74:21-75:13.  Blackseth testified

6    that installing an offset flange would not be sufficient and rotating the toilet would require relocation

7    of plumbing, Tr. 105:21-106:2, but Defendants provided no evidence challenging Plaintiff's estimate

8    of the costs of repositioning the toilet and sink, because on Plaintiff's motion, the court refused to

9    allow Blackseth to testify on that subject.[12]  Furthermore, Metaxas testified that the Trust would be

10   able to pay $10,000 to cover capital improvements at Bacco.  Tr. at 154:19-21.  The court therefore

11   finds that financial factors do not prohibit a determination that repositioning the toilet and sink is

12   readily achievable.

13         However, the court nonetheless determines that Plaintiff's remediation plan is not readily

14   achievable because Defendants put forth unrebutted expert testimony that the suggested repairs

15   would violate building codes and would not be allowed by the permitting authorities.  Blackseth

16   testified that building codes require 48" of clear space in front of the toilet; Plaintiff's plan, which

17   would not provide the required 48", would not receive a permit and therefore could not be built.  Tr.

18   at 109:24-110:12.  *Accord* Cal. Code Regs. tit. 24 (2013, effective Jan. 1, 2014) (Cal. Building

19   Standards Code) Ch. 11B § 604.3.1 ("A minimum of 50 inches (1524 mm) wide and 48 inches

20   (1219) deep maneuvering space shall be provided in front of the water closet."); Cal. Code Regs. tit.

21   24 (2010) (Cal. Building Code) Ch. 11B § 1115B.3.2 (same).[13]  Plaintiff did not provide contrary

22   evidence.  As discussed above, the court finds that the ADA does not automatically preempt state

23   building codes such as to prevent this court from determining that a suggested repair for which a

24   building permit would not be issued is not a readily achievable repair.

25   _____

26         [12]  The court did not permit Plaintiff's expert Blackseth to testify to the monetary cost of the
     suggested plan, because, as stated in the pretrial order, "Blackseth did not discuss cost in his report;
27   Plaintiff therefore was not put on notice and did not have a fair opportunity to decide whether to depose
     Mr. Blackseth on that topic, and/or to designate a rebuttal expert.  Allowing Mr. Blackseth to testify
28   about the cost of various repairs or removal of architectural barriers would result in prejudice to
     Plaintiff."  Docket No. 81 at 4.  *See also* Tr. at 92:15-20.

         [13]  The California Building Standards Code (Title 24 of the California Code of Regulations) may
     be accessed online at http://www.bsc.ca.gov/codes.aspx (last accessed February 7, 2014).

United States District Court
For the Northern District of California

### iii.  Doorway Width

#### a.  Is the doorway width an architectural barrier?

The post-remediation width of the restroom doorway is 30 inches.  RAFS ¶ 4 ("The existing men's restroom at Bacco prior to conversion to a unisex restroom did not have a door that when open at 90 degrees provided 32" of clearance as required by ADAAG . . . .  No remedial work was done to widen the door."); Pl.'s Ex. 39 (Sarantschin report of inspection dated September 17, 2012, noting that unisex restroom doorway had only 30" clearance when opened at 90 degrees); Pl.'s Ex. 41 (showing as-is doorway width of 30 inches).   This does not meet the ADAAG standard, which requires that "doorways shall have a minimum clear opening of 32 in. [] with the door open 90 degrees."  28 C.F.R. Pt. 36, App. D § 4.13.5.  The parties stipulated that the width of the doorway is an architectural barrier.  JFFCL at 4 ¶ 5 ("The door to the men's restroom at Bacco Restaurant does not provide 32" of clearance when open at 90 degrees, and therefore constitutes an architectural barrier pursuant to ADAAG § 4.13.5.").

#### b.  Would Plaintiff's suggested method of removing the barrier improve access?

Blackseth testified that he did not believe that widening the doorway to 32" from 30" would improve the accessibility of the restroom.  Tr. 100:23-101:1 ("Quite frankly, I don't think it would make it any better.  For me to make a turn in my electric wheelchair from a 42-inch opening into a 32-inch opening would be extremely difficult.").  However, somewhat contrary to his own testimony, Blackseth also opined that the use of offset hinges in the doorway, which would have the effect of broadening the doorway, "is an excellent idea," is "appropriate" and would "help" with accessibility.  Tr. at 100:13-20.  Plaintiff has thus met his burden of demonstrating that expanding the doorway would improve access to the restroom.

#### c.  Is Plaintiff's suggested method of removing the barrier readily achievable?

Plaintiff suggested two methods of expanding the doorway to improve access to the restroom: widening the doorway, or using offset hinges.

#### 1.  Widening the Doorway

Plaintiff's suggested repairs include installing a wider door which would provide 32" of clearance when opened to 90 degrees.  Pl.'s Ex. 42.  Gregg's report shows that labor and materials

United States District Court
For the Northern District of California

costs for this new door would be $525.13. Gregg Report at 4. At trial, Gregg testified that the total

cost of installing a wider door would be $734.58. Tr. at 64:21-65:10.

Defendants produced no evidence regarding whether Plaintiff's suggestion to install a wider

door is readily achievable. Defendants' expert admitted at trial that he had overlooked the doorway

width barrier in his report:

> **Frankovich [Plaintiff's counsel]**: Nowhere in your report do you discuss door width or
> door swing, isn't that correct?
>
> **Blackseth**: I don't talk about door swing because I was going to leave it swinging in. But
> you are correct, no one is perfect . . . . I am not perfect. I do a lot of these.

Tr. at 100:10-19. Defendants did not produce evidence or argument, including expert or lay

testimony, regarding the costs of installing a wider door or any of the other variables the court may

consider when determining whether a repair is readily achievable.

The ADAAG standards list widening a door as an example of a repair likely to be readily

achievable. *See* 28 C.F.R. Pt. 36, App. B - Preamble to Nondiscrimination on the Basis of Disability

by Public Accommodations and in Commercial Facilities, 56 Fed. Reg. 35544-01 ("Section

36.304(b) provides a wide-ranging list of the types of modest measures that may be taken to remove

barriers and that are likely to be readily achievable."); § 36.304(b) ("Examples of steps to remove

barriers included . . . widening doors . . . ."); § 36.304(c) ("[A] public accommodation should take

measures to provide access to restroom facilities. These measures include . . . widening of doors.").

Considering this, and Plaintiff's evidence regarding the costs of installing a wider door and the

parties stipulation that the landlord has funds to cover $10,000 of renovations, the court finds that

Defendants have failed to prove that Plaintiff's suggestion for removing the doorway width barrier

by installing a wider door was not readily achievable. Accordingly, Defendants violated the ADA

by failing to do so, and Plaintiff is entitled to injunctive relief.

### 2. Offset Hinges

With respect to the installation of offset hinges, Plaintiff presented no evidence on the cost or

nature of the action required. Offset hinges were not discussed in Gregg's cost estimate,

Sarantschin's submissions, or any other evidence presented by either Plaintiff or Defendants. The

suggestion appeared to have been raised for the first time through Plaintiff's counsel, in a

hypothetical he posed to Gregg. Tr. at 72:22 ("Frankovich: Let me ask you this. If you took that

United States District Court

For the Northern District of California

1  existing door . . . and put offset hinges on, how much more clear space would you get by doing

2  that?").

3      Plaintiff did not present sufficient evidence so that Defendants could evaluate the proposed

4  solution to a barrier and the difficulty of accomplishing it.  *See Colorado Cross,* 264 F.3d at 1009

5  (plaintiff failed to satisfy its initial burden where its expert provided only speculative conceptual

6  sketches for the proposed modification rather than a specific design).  Blackseth's testimony that

7  offset hinges are an "excellent idea" that would "help" with accessibility, speaks to the fact that

8  offset hinges would improve access.  It does not speak to the question of whether widening the

9  doorway through use of offset hinges is readily achievable.  Although common sense leads the court

10  to believe that installation of offset hinges is likely to cost no more than widening the doorway and

11  replacing the door, and is unlikely to trigger a building permit obstacle, the court cannot make a

12  finding without the existence of evidence.  More importantly, it is improper for an ADA plaintiff to

13  surprise a defendant at trial with newly suggested remediations.  The mechanisms embodied in the

14  *Colorado Cross* burden-shifting process and in this district's general order regarding ADA access

15  litigation[14] provide Plaintiff with the opportunity to propose a concrete remediation plan for

16  Defendant to consider and possibly implement to address a particular barrier.  Allowing a Plaintiff to

17  raise a proposed remediation for the first time at trial is antithetical to this process. The court

18  therefore finds that Plaintiff failed to meet his initial burden of suggesting offset hinges as a readily

19  achievable method for the removal of the doorway width barrier.

20  **E.  State Law Claims**

21      **i.  The Unruh Act**

22      The Unruh Act broadly outlaws arbitrary discrimination in public accommodations,

23  including discrimination based on disability.  Cal. Civ.Code § 51(b); *Jankey v. Sung Koo Lee,* 55

24  Cal.4th 1038, 1044, 150 Cal.Rptr.3d 191, 290 P.3d 187 (2012).  In the disability context, the Unruh

25  Act operates virtually identically to the ADA.  *Molski,* 481 F.3d at 731. Any violation of the ADA

26  necessarily constitutes a violation of the Unruh Act.  *Id.* (citing Cal. Civ.Code § 51(f)).  Where the

27  basis of liability for an Unruh Act violation is an ADA violation, plaintiff need not prove intentional

28

---

[14]  *See* General Order 56, http://www.cand.uscourts.gov/filelibrary/14 2/GO_56_5-29-12_ Corrected.pdf (last accessed March 14, 2014).

United States District Court
For the Northern District of California

1  discrimination. *Munson v. Del Taco, Inc.,* 46 Cal.4th 661, 678, 94 Cal.Rptr.3d 685, 208 P.3d 623

2  (2009).  Moreover, the Unruh Act allows for monetary damages including automatic minimum

3  penalties in the amount of $4,000, and attorneys' fees as "may be determined by the court." Cal. Civ.

4  Code § 52.  Proof of actual damages is not required to recover statutory minimum damages under

5  the Unruh Act.  *See, e.g., Botosan v. Paul McNally Realty,* 216 F.3d 827, 835 (9th Cir.2000).

6  **ii.  The CDPA**

7  The CDPA, Cal. Civ. Code. § 54, substantially overlaps with and complements the Unruh

8  Act, although it is narrower in focus.  *Jankey,* 55 Cal.4th at 1044, 150 Cal.Rptr.3d 191, 290 P.3d

9  187.  It ensures that people with disabilities have equal rights of access "to public places, buildings,

10  facilities and services, as well as common carriers, housing and places of public accommodation."

11  *Id.* at 1044–45, 150 Cal.Rptr.3d 191, 290 P.3d 187 (citation omitted). As with the Unruh Act, the

12  California Legislature amended the CDPA to incorporate ADA violations and make them a basis for

13  relief under the act. *Id.;* Cal. Civ.Code §§  54(c), 54.1(d).  The CDPA allows for monetary damages,

14  including automatic minimum penalties in the amount of $1,000, and attorneys' fees for the

15  prevailing party. Cal. Civ. Code § 54.3(a), § 55.  Recognizing the overlap between the Unruh Act

16  and the CDPA, the Legislature expressly foreclosed recovery under both acts. Cal. Civ.Code §

17  54.3(c).

18  **iii.  California Civil Code § 55.562**

19  "The California Legislature enacted the Construction Related Accessibility Standards

20  Compliance Act in 2009, embodied in California Civil Code §§ 55.51-55.57, to improve compliance

21  with disability access laws while protecting businesses from abusive access litigation."  *Kohler v.*

22  *Presidio Int'l, Inc.*, No. 10-cv-4680-PSG PJWX, 2013 WL 1246801, at *6 (C.D. Cal. Mar. 25, 2013)

23  (citing Cal. Civ.Code §§ 55.51-55.57; *Munson v. Del Taco, Inc.*, 46 Cal.4th 661, 677 (2009)).  This

24  legislation restricts the availability of statutory damages under the Unruh Act and the DPA.  *Id.*

25  (citing *Munson,* 46 Cal.4th at 677).

26  Section 55.56 requires that a plaintiff seeking statutory damages under the Unruh Act or

27  DPA show that the violation denied the plaintiff "full and equal access," which can occur either if

28  (1) the plaintiff "personally encountered" the barrier on a particular occasion or (2) the plaintiff was

United States District Court

For the Northern District of California

1   deterred from accessing that place of accommodation on a particular occasion.  Cal. Civ. Code §

2   55.56(a)-(b); *Munson,* 46 Cal.4th at 677.

3        As to the first circumstance, personally encountering a barrier may be sufficient to give rise

4   to damages if "the plaintiff experienced difficulty, discomfort, or embarrassment because of the

5   violation."  Cal. Civ. Code § 55.56(c).  Thus a plaintiff proceeding under this provision "must offer

6   evidence of difficulty, discomfort, or embarrassment in relation to his personal encounter of a barrier

7   in order to recover statutory damages under the Unruh Act or the DPA."   *Kohler*, 2013 WL

8   1246801 at *7 (discussing prior courts' analysis of the statutory language and citing *Mundy v.*

9   *ProThro Enterprises*, 192 Cal. App. 4th Supp. 1, 6, 121 Cal. Rptr. 3d 274 (2011) and *Doran v.*

10  *7–Eleven, Inc.*, Nos. 11-55031, 11-55619, 2013 WL 602251, at *1 (9th Cir. Feb. 19, 2013).

11       As to the second circumstance, a deterrence will only give rise to damages if (a) the plaintiff

12  had actual knowledge of a violation and (b) the violation would have actually denied the plaintiff

13  full and equal access if he attempted to access the place on a particular occasion. *Id.* § 55.56(d).

14  **iv.  California Health and Safety Code § 19955**

15       The FAC alleges a state law claims arising under California Health & Safety Code § 19955,

16  et seq.  The purpose of § 19955 is to ensure that places of public accommodation constructed with

17  private funds adhere to the accessibility standards in California Government Code § 4450.  Cal.

18  Health & Safety Code § 19955.  Government Code § 4450 requires that all buildings constructed

19  with public funds be accessible to and usable by the physically handicapped.  It also directs the State

20  Architect to develop standards for making buildings accessible to persons with disabilities.  Cal.

21  Gov. Code § 4450.  The requirements of Section 19955 only apply to public accommodations

22  constructed on or after (or altered on or after) July 1, 1970, the effective date of the legislation.  Cal.

23  Health & Safety Code §§  19955, 19959; *Marsh v. Edwards Theatres Circuit, Inc.,* 64 Cal.App.3d

24  881, 888, 134 Cal.Rptr. 844 (1976), *superceded by statute on another ground, see Hankins v. El*

25  *Torito Rest., Inc.,* 63 Cal.App.4th 510, 521, 74 Cal.Rptr.2d 684 (1998); *Mannick v. Kaiser Found.*

26  *Health Plan, Inc.*, No. 03-cv-5905-PJH, 2006 WL 1626909, at *6 (N.D. Cal. June 9, 2006).

27       No evidence in the record demonstrates that the building that houses Bacco was constructed

28  on or after, or altered on or after, July 1, 1970, within the meaning of the statute.  Plaintiff's post

1  trial submissions do not address this statute.  Therefore, Plaintiff is deemed to have abandoned his

2  claim premised on Section 19955.

3  **v. Damages**

4  Having proven that Bacco failed to make a readily achievable repair by widening the

5  restroom door, Plaintiff has therefore established that the same barrier violates the CPDA and Unruh

6  Act as well, and is entitled to damages.  *See* Cal. Civ. Code §§ 51(f), 54(c); *see also Rodriguez*, _ F.

7  Supp. 2d. _, 2014 WL 31739 at *17.  As a preliminary matter, Plaintiff has satisfied the

8  requirements for statutory damages under California Civil Code § 55.562 because he personally

9  encountered the restroom barriers on each of his visits to Bacco, and this caused him difficulty

10  because he was unable to use the restroom.  Plaintiff now seeks statutory damages under the Unruh

11  Act of $4,000 for each of his four visits to Bacco, or $16,000 total.  Defendants argue that Plaintiff is

12  only entitled to statutory damages in the amount of $4,000.

13  Under Section 55.56, multiple awards may accrue to plaintiffs as a result of multiple visits to

14  a facility.  *See* Cal. Civ. Code § 55.56(e) ("Statutory damages may be assessed . . . based on each

15  particular occasion that the plaintiff was denied full and equal access . . . .").  *See also Yates v.*

16  *Vishal*, No. 11-cv-643-JCS, 2013 WL 6073516, at *3 (N.D. Cal. Nov. 18, 2013) ("In the hotel and

17  restaurant context, a plaintiff can recover separate statutory damages for each time a plaintiff visits

18  (or is deterred from visiting) a non-compliant establishment . . . ."); *Grutman v. Regents of Univ. of*

19  *California,* 807 F.Supp.2d 861, 869 (N.D. Cal. 2011) (quoting *Org. for the Advancement of*

20  *Minorities with Disabilities v. Pacific Heights Inn,* 2006 W L 2560754 (N.D.Cal. Sept. 5, 2006)).

21  The award of statutory damages for multiple occasions of discrimination at a public accommodation

22  is permissive rather than mandatory.  Cal. Civ. Code § 55.56(e) ("Statutory damages may be

23  assessed . . . based on each particular occasion . . . ."); *see also Ramirez v. Sam's for Play*, No. 11-

24  cv-1370-MEJ, 2013 WL 4428858, *8-9 (N.D. Cal. Aug. 15, 2013) (denying motion for summary

25  judgment on the issue of multiple statutory damages).

26  "The California Supreme Court has stated in dicta that there may be a point at which

27  statutory damages for each offense will be so high that equity and constitutional constraints cabin a

28  defendant's liability under the Unruh Act."  *Vogel v. Rite Aid Corp.*, No. 13-cv-288-MMM EX,

2014 WL 211789, at *11 (C.D. Cal. Jan. 17, 2014) (awarding plaintiff a total of $12,000, or $4,000

United States District Court

For the Northern District of California

1    for each of plaintiff's three visits) (citing *Angelucci v. Century Supper Club,* 41 Cal. 4th 160, 179-80

2    (2007)).  However, an award of the size Plaintiff requests does not appear to trigger such concerns,

3    as courts frequently make an award of this magnitude under the Unruh Act.  *See e.g.*, *Vishal Corp.*,

4    2013 WL 6073516 at *5 (awarding $12,000 based on three occasions that plaintiff visited defendant

5    hotel/restaurant); *McCune v. Singh*, No. 10-cv-02207-JAM, 2012 WL 2959436 (E.D. Cal. July 19,

6    2012) *motion for relief from judgment denied*, 10-cv-02207-JAM, 2013 WL 3367515, at *5 (E.D.

7    Cal. July 5, 2013) ("Plaintiff visited the Plaza four times to patronize its stores and encountered

8    barriers to access each time in violation of the ADA, and he is therefore entitled to $16,000 in

9    damages under the Unruh Act, $4,000 for each visit."); *Freezor v. Del Taco, Inc.* 431 F. Supp. 2d

10   1088, 1091 (S.D. Cal.2005) ("[T]he Court finds Plaintiff is entitled to the statutory minimum of

11   $12,000–$4,000 for each time he patronized the Restaurant").

12           Even if equitable or constitutional concerns do not prohibit the award of multiple statutory

13   damages, the court must consider whether Plaintiff has met his duty to mitigate damages.  Cal. Civ.

14   Code § 55.56(g) ("[Section 55.56] does not alter . . . any legal obligation of a party to mitigate

15   damages.").  "One way that plaintiffs may fail to meet their duty is to make multiple visits to the

16   same facility before they could reasonably expect that the barrier was corrected; this is sometimes

17   referred to as stacking."  *Vishal Corp.*, 2013 WL 6073516 at *4.  In *Ramirez*, for example, the court

18   denied summary judgment for plaintiffs on the issue of multiple statutory damages because a factual

19   question remained as to whether plaintiffs had met their duty to mitigate their damages.   2013 WL

20   4428858 at *8.  The plaintiffs were entitled to one award for their first visit to the non-compliant

21   facility, but the court found that the fact that they increased the frequency of their visits just prior to

22   filing suit—up from eight times per year to three times in one month—gave rise to a question of fact

23   regarding mitigation.  *Id.*; *see also Vishal Corp.*, 2013 WL 6073516 at *4 (describing *Ramirez*

24   holding).

25           At trial, Defendants had the opportunity to question Plaintiff  about his four visits to Bacco

26   over a three-month period.  Defendants chose not to question Plaintiff about these details.  Nothing

27   in the record suggests that Plaintiff engaged in inappropriate behavior to "stack" his damages.  The

28   court thus finds that each of Plaintiff's four visits to Bacco between December 15, 2010 and March

9, 2011 gives rise to a separate award of statutory damages under the Unruh Act and Section 55.56.

**United States District Court**
For the Northern District of California

### IV.  Conclusion

Defendants have violated the ADA, Unruh Act, and CDPA by failing to make a readily achievable repair to widen a doorway that presented an architectural barrier at Bacco.  Plaintiff failed to establish that Defendants violated federal or state law with respect to the swing of the restroom door, or the "clear space" inside the restroom.  Accordingly, the court grants Plaintiff injunctive relief in part, and orders that Defendants immediately remove the doorway barrier in a manner consistent with this decision.  In addition, the court finds Defendants liable to Plaintiff for statutory damages in the amount of $16,000.  The parties are directed to meet and confer and jointly submit a proposed judgment consistent with this order by **March 26, 2014**.  This matter is referred to the ADR unit for  appointment of a mediator.  If the parties cannot resolve the matter through mediation, Plaintiff shall file a motion for attorneys' fees and costs by **May 23, 2014**.

IT IS SO ORDERED.

Dated:  March 17, 2014



DONNA M. RYU
United States Magistrate Judge

26